UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| PATSY SAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No.: 6:16-cv-00081-GFVT |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| APPALACHIAN REGIONAL | ) | **&** |
| HOSPITAL, | ) | **ORDER** |
| | ) | |
| Defendant. | | |

\*\*\* \*\*\* \*\*\* \*\*\*

Patsy Saylor is challenging the denial of long-term disability benefits by Appalachian Regional Hospital (ARH) under an employee pension plan governed by the Employee Retirement Income Security Act of 1974 (ERISA). As explained below, Judgment will be entered in favor of ARH.

**I**

**A**

Appalachian Regional Hospital (ARH) owes Sawyer a fiduciary duty when it comes to administering the ARH Pension Plan. The question here is whether that duty has been violated. The parties agree that the pension plan and its administration by ARH's Pension Committee is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001. [R. 11-1 at 1, R. 12-1 at 2.]

Saylor began working for ARH in Harlan, Kentucky on May 15th, 1978, and remained an employee, most recently as a Respiratory Therapist, until February 11, 2015. [R. 1-1 at 3.] As part of her employment, Saylor became a member of the ARH Pension Plan (the Plan), which provides disability retirement benefits to eligible employees of ARH. [R. 8-1 at 25.]

On January 28, 2015, Saylor suffered a non-work related injury when she fell off her front porch and injured her lower back. [R. 11-1 at 3.] Saylor first sought medical attention approximately a week after the fall form her primary care physician Lisa Bennet, PRN, on February 5, 2015. [R. 8-2 at 45.] Bennett diagnosed Saylor as having "lumbago," or pain in the muscles or joints of the low back [*Id.* at 46], and maintained the same diagnosis after two follow-up visits with Saylor, ultimately prescribing a back brace on February 20, 2015. [*Id.* at 55.] The medical records from these three visits indicate that Saylor was off work at the time and "[felt] like a hindrance to her co-worker." [*Id.* at 52.]

Thereafter, Saylor was referred to Dr. Yasser Nadim for further evaluation on February 25, 2015. [*Id.* at 98.] Dr. Nadim diagnosed Saylor as having a compression fracture of her lumbar vertebra. [*Id.* at 99.] Dr. Nadim's diagnosis and course of action remained the same through multiple visits in March and April, recommending "conservative management" and use of the back brace. [*Id.* at 90, 93, 96.] Significantly, at no point before his submission of the Disability Certification Form on August 19, 2015 [*Id.* at 13] did Dr. Nadim explicitly state that Saylor could not return to her job as a Respiratory Therapist. [*See id.* at 85, 99.] After Saylor's final appointment with Dr. Nadim on April 29, 2015, she had no further interaction with him until August of 2015 when she requested he complete paperwork for her application for disability retirement benefits through ARH. [*Id.* at 13-16.]

Saylor also visited Dr. Jamal S. Bazzi, an orthopedic surgeon, on May 14, 2015. [*Id.* at 56.] Dr. Bazzi confirmed the prior diagnosis of a fracture of her lumbar vertebra, and noted "[i]t is unusual for a vertebra compression fracture to have this protracted course and to cause this severe pain after 4 months of the injury." [*Id.* at 58.] Dr. Bazzi prescribed a "jewett brace" for

2

comfort and protection and advised Saylor to engage in limited aerobic activity and to only lift objects in a certain restricted manner. [*Id.*]

Following her May 2015 visit with Dr. Bazzi, Saylor again followed up with her primary care physician, APRN Bennett, complaining of back pain and stating she "could barely move." [*Id.* at 63.] About two months later, Saylor came back to Bennett with "complaints of severe back pain," at which point Bennett advised another MRI. [*Id.* at 65-66.] The MRI results were in keeping with previous diagnoses, finding that Saylor showed "[s]igns of diffuse lumbar disc disease" in addition to a "[h]ealing moderate superior endplate compression fracture" and mild bulging discs. [*Id.* at 43.] Ten days later, a follow up with Dr. Rogelio L. Uy, indicated apparent progress, with the report stating that "[s]he feels better" and was "in no distress." [*Id.* at 67-68.]

Nevertheless, in October 2015, Saylor made an emergency room visit where the attending physician, Patricia Coldiron, APRN, stated that "[p]atient cannot walk without assistance" and further that "[p]atient is able to walk but does so with difficulty due to back pain." [*Id.* at 72.] After the ER visit, in two November visits with APRN Bennett, Saylor again complained of severe back pain and Bennett continued with her diagnosis of lumbago, counseling Saylor to maintain the current conservative management after Saylor was told by Neurosurgeon, Dr. Bean that she was not a candidate for surgery. [*Id.* at 80, 82.]

ii

In the course of Saylor receiving medical treatment and assessment, the Social Security Administration (SSA) found her to be disabled and awarded Social Security Disability benefits. [*Id.* at 102.] This occurred in May 2015. Several weeks later, Saylor filed a claim for disability retirement benefits available through the ARH Pension Plan. [*Id.* at 3.]

Next, ARH received a completed Disability Certification Form from the Plaintiff's treating physician, Dr. Yasser Nadim, which indicated that Saylor was permanently disabled and

3

could not perform her duties as a respiratory therapist. [R. 8-2 at 13.] Dr. Nadim's submission triggered further medical review of Saylor's disability claim by ARH.[1] [R. 11-1 at 3-4, R. 12-1 at 8-9.]

After this review, Dr. Bart Olash, ARH's reviewing doctor, recommended that Saylor could continue her job without restrictions. [R. 8-2 at 19.] In keeping with the procedures set out in Section 6.04(d) of the Plan, independent medical review was undertaken after Dr. Olash's recommendation. [*Id.* at 7; *see* R. 8-1 at 42.] Dr. Gregory T. Snider, the independent physician who then gave the "third, final[,] and binding exam," [R. 8-2 at 7] in November 2015, concluded that Saylor was employable with restrictions. [*Id.* at 23.] Dr. Snider stated:

> Although Ms. Saylor has had a significant injury, her complaints seem considerably out of proportion to the pathology defined.… While I do not doubt that she would have difficulty performing the work of a respiratory therapist, it is my opinion that she is not totally disabled based on the ARH definition. In my opinion, she could be employable at some type of work.

[*Id.*]

On November 20, Saylor was officially notified via letter from Sonya C. Bergman that she did "not meet the criteria of the ARH definition of total disability" and thus her application for Disability Retirements Benefits was denied by ARH. [*Id.* at 7.] The Pension Committee found that Saylor did not meet the criteria for the ARH Pension Plan's definition of Total Disability, thereby denying her claim, based upon information comprising the Administrative Record [R. 8-2], including the opinions, medical information, and testing results provided by Saylor's treating physicians and the opinions of ARH's reviewing physicians. [R. 12-1 at 1-2.]

---

[1] Medical review was undertaken pursuant to § 6.04(d) (subsection entitled "Disability Claim") of the Plan which states: "[F]rom and after the date this Plan provides for determination of Total Disability to be made by the [Pension] Committee (rather than in sole reliance on a Social Security determination), the [Pension] Committee will adjudicate such claim by deference to the medical opinion of an Employer-designated physician at the initial claims level." [R. 8-1 at 42.]

4

After receiving the denial letter, Saylor requested a full and fair Pension Committee review of the denial, forwardin medical records to support her claim of Total Disability. [R. 8-2 at 9.] A little over a month later, on January 26, 2016, Saylor received a letter from ARH legal counsel entitled "Conclusive Decision from Retirement Committee" which stated:

> [W]hile Ms. Saylor may be disabled from performing her current position at ARH, she does not meet the criteria for ARH Pension Plan's definition of total disability which bases eligibility on whether the claimant is totally disabled from performing any work duties related to any position for which she may be otherwise qualified.

[*Id.* at 10.]

Saylor claims that due to the final and conclusive nature of the denial, she had exhausted all of her administrative remedies [*Id.* at 2], and thus filed a civil action for violation of 29 U.S.C. 1132(a)(1)(B) against ARH on April 21, challenging the decision of ARH to deny her application under the Pension Plan. [R. 1-1.] ARH removed the action to this Court pursuant to 28 U.S.C. § 1441. [R. 1.]

### iii

To be "deemed Totally Disabled for purposes of [the] plan" [R. 8-1 at 16] an employee needs to meet three eligibility requirements: 1) the condition which allegedly prevents the employee from continuing employment must have arisen after January 1, 1973; 2) that the employee have "earned five (5) or more Years of Service" with ARH; and 3) it must be further determined that the employee is in fact "Totally Disabled" in accordance with the provisions of the Pension Plan. [R. 1-1 at 7, R. 8-1 at 16.] In the present case, it is undisputed that Saylor meets each of the first two requirements. The sole point of contention revolves around the determination by the Pension Committee that Saylor did not satisfy the definition of Totally Disabled under the Plan and whether the Committee was in fact afforded discretion under the Plan to make that determination. [R. 11-1 at 11, R. 12-1 at 17-19.]

The parties rely on different Plan provisions in support of their respective interpretations of how an employee is determined to be Totally Disabled under the Plan. Saylor relies on the SSA-based standard in Section 4.06 (entitled "Disability Retirement") which states: "When at [sic] Member who has earned at least five (5) years of Service *shall be determined to be Totally Disabled if [sic], the Member is declared disabled by the Social Security Administration* on or before the Member's termination of employment with Employer." [R. 8-1 at 25.] In contrast, Defendant ARH relies upon Sections 6.04(d) and 2.38, two provisions within the Plan which conflict with the above SSA-based standard. Section 6.04(d) (entitled "Disability Claim") states: "[F]rom and after the [sic] date this Plan provides for determination of Total Disability to be made by the [Pension] Committee (*rather than in sole reliance on a Social Security determination*)…" [*Id.* at 42.] Similarly, Section 2.38 (entitled "Totally Disabled") states: "[T]he Pension Committee makes a determination of the Member's Total Disability based on medical evidence." [*Id.* at 10.]

Saylor's argument is that the Committee should have evaluated her Total Disability claim under Section 6.04 of the Plan only if she had not met the criteria of the SSA-based standard, Section 4.06. Therefore, Saylor argues that analysis under Section 6.04 should not have been undertaken as she met the SSA-based standard upon being awarded Social Security Disability benefits. [R. 11-1 at 11, R. 8-2 at 102.] In other words, the argument is that "proper procedure" dictates that if an employee meets the SSA-based standard then further review of the claim pursuant to Section 6.04 is unnecessary, analysis by the Committee should end, and the disability benefits should be awarded to the trustee. [R. 11-1 at 11.] Saylor claims such an interpretation is further bolstered by the "well established" rule of construction within contract law that "any ambiguity of a contract be construed against the party who prepared the contract," here, ARH.

6

[*Id.*] Thus, the argument follows, in attempting to reconcile the language in Sections 6.04(d) and 2.38 and the language within Section 4.06, if ambiguity is found then it should be construed against ARH and in favor of the plaintiff, Saylor. [*Id.* at 12.]

In response, ARH argues that, based upon two amendments to the Plan, the correct provisions were applied in administering Saylor's claim for benefits. [R. 12-1 at 17.] The Amendments, Amendment 2008-1 [R. 12-2] and Amendment 2010-2 [R. 12-3], both stated that that disability determinations should be made by the Pension Committee. [R. 12-1 at 17-18.] In the Recital section of Amendment 2010-2, it states as follows:

> In Amendment 2008-1 this plan's definition of disability [§ 2.38] was altered to allow for a committee determination rather than requiring a Social Security Administration determination, but at that time, other references to reliance upon and benefits not beginning until after Social Security benefits begin were inadvertently not eliminated. That scrivener's error is corrected by this amendment.

[R. 12-3 at 1.] However, upon amending the Plan a second time, ARH failed, a second time, to eliminate the language within the provision at issue, Section 4.06, again supposedly due to a "scrivener's error." [R. 12-1 at 19.] In spite of these errors, ARH maintains that "[t]he language … in section 4.06 appears to conflict with the language of Sections 2.38 and 6.04(d) … and the intent of the parties as expressed through the Plan Amendments." [*Id.* at 20.] ARH concludes that to adopt Saylor's interpretation of the Plan in awarding the benefits based solely on the SSA determination of disability "would wholly undermine the express authority of the Pension Committee as established through these Amendments, as well as the express intent of the parties." [*Id.*]

# II

## A

"General rules of contract interpretation incorporated as part of the federal common law of contract interpretation guide . . . in construing an ERISA plan." *Hunter v. Caliber System, Inc.*, 220 F.3d 702, 712 (6th Cir. 2000). Under well-established federal common law, the first step in interpretation of an ERISA plan is to ascertain the parties' intent by examining the plan documents. *Musto v. American Gen. Corp.*, 861 F.2d 897, 900-01 (6th Cir. 1988), *cert. denied*, 490 U.S. 1020 (1989); *see also Citizens Ins. Co. of Am. V. MidMichigan Health ConnectCare Network Plan*, 449 F.3d 688, 692-693 (6th Cir. 2006) ([T]he Court's paramount responsibility in construing plan language is to ascertain and effectuate the underlying intent.") (citations omitted). This means that the Court "must interpret the … Plan provisions according to their plain meaning, in an ordinary and popular sense." *Hunter*, 220 F.3d at 712 (internal citations and quotation marks omitted). The plain meaning approach requires the Court to "give effect to the unambiguous terms of an ERISA plan." *Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir. 1996).

When resolving any apparent plan ambiguities, "ERISA plans, like contracts, are to be construed as a whole." *Mitzel v. Anthem Life Ins. Co.*, 351 F. App'x 74, 90 (6th Cir. 2009) (citations omitted); *see also Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 95 (3d Cir. 1992) ("In interpreting an ambiguous ERISA plan, a court may consider the intent of the plan's sponsor, the reasonable understanding of the beneficiaries, and past practice, among other things."). Additionally, where "a court determines that a contract provision is ambiguous, then it 'may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence.'" *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996) (quoting *Boyer v. Douglas*

*Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993)). The language of a plan provision is ambiguous "if it is subject to two reasonable interpretations." *Boyer*, 986 F.2d at 1003.

Defendant contends the Court should apply the doctrine of scrivener's error as part of federal common law, as adopted by other federal circuit courts of appeal[2], in interpreting the immediate ERISA plan and allow extrinsic evidence to determine the intent of the parties. However, as neither the Sixth Circuit nor the Supreme Court have directly ruled upon the application of the doctrine of scrivener's error within the context of an ERISA dispute, the Court declines to apply the doctrine in the instant case. Instead, the Court will apply the traditional methods of contract interpretation detailed above, recognized by both the Sixth Circuit and Supreme Court, to resolve the current dispute.

**B**

The relevant provisions within the Plan, Sections 6.04(d) and 2.38, and the SSA-based standard, Section 4.06, outline contrasting processes for determining whether a member of the Plan is entitled to Total Disability retirement benefits.[3] These contrasting provisions cannot be reconciled. As such, the Court finds that ambiguity exists within the Plan and thus, will "construe[] [the Plan] as a whole," *Mitzel*, 351 F. App'x at 90, using traditional methods of contract interpretation to determine the intent and understanding of the parties. *Boyer*, 986 F.2d at 1005. After considering the documents which accompany the Plan, including the Summary

---

[2] Other circuits, namely the Seventh Circuit, have utilized the scrivener's error doctrine to allow for the introduction of extrinsic evidence to determine parties' intent based upon principles of equity, even where the plain text of the plan is unambiguous. *See Young v. Verizon's Bell Atlantic Cash Balance Plan*, 615 F.3d 808 (7th Cir. 2010); *cf. Cross v. Bragg*, 329 F. App'x 443 (4th Cir. 2009) (applying the scrivener's error doctrine yet finding that the party seeking reformation of the ERISA plan at issue failed to establish proof of the error).

[3] Section 2.38 states, "the Pension Committee makes a determination of the Member's Total Disability based on medical evidence" whereas Section 4.06 states that the Member "…shall be determined to be Totally Disabled if … declared disabled by the Social Security Administration."

9

Plan Description[4][R. 12-4] and Plan Amendments [R. 12-2, R. 12-3], the Court concludes that the determination of Total Disability was within the discretion of the Pension Committee, in accordance with Sections 6.04(d) and 2.38, and therefore, ARH's decision to deny Total Disability benefits will be upheld.

Under ERISA, employers have significant discretion in crafting pension plans and in defining the terms of the plans. *See, e.g.*, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (1965). Accordingly, in 2008 and 2010, ARH attempted to amend the Plan to replace the SSA-based standard and specify that the Pension Committee now retained the discretion to make determinations of Total Disability. Both attempts, Amendment 2008-1 [R. 12-2] and Amendment 2010-2 [R. 12-3], failed to amend the Plan with any clarity. In fact, although "replacing the standard in [Section] 4.06 was the primary purpose of these Amendments," [R. 12-1 at 19] the SSA-based standard has remained in the Plan, in direct contradiction to the Summary Plan Description, the recital sections of the Amendments, and the duly amended Sections 2.38 and 6.04(d). Despite ARH's contract-drafting failures, the Court, construing the Plan as a whole, finds that these poorly executed attempts at amendment are conclusive evidence that the SSA-based standard in Section 4.06 remained in the Plan due to a drafting oversight and further, that a solely SSA-based determination is contrary to, and would "wholly undermine," the intent of the parties. [R. 12-1 at 20.] The Amendments and the Summary Plan Description[5] reflect an understanding between ARH and members of the Plan that Total Disability eligibility

---

[4] The Court acknowledges that "[a]lthough [Summary Plan Descriptions] are not considered to be 'legally binding,' nor are they 'parts' of the benefit plan themselves, *see CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), they may be used as extrinsic evidence to resolve ambiguities in the contractual language." *Moore v. Menasha Corp.*, 690 F.3d 444, 455-56 (6th Cir. 2012).
[5] The Summary Plan Description [R.12-4], dated May, 2014, states: "If you become disabled while an Employee of ARH *as determined by the Pension Committee* after earning at least five (5) years of Service, you will be retired on the date of your disability."

determinations are within the discretion of the Pension Committee. Significantly, the Plan documents themselves, including both the amended provisions[6] and the recital sections of the Amendments, refer specifically to replacing the previous SSA-based standard to allow instead for the Pension Committee to make determinations based upon review of the medical evidence. [R. 8-1 at 42; *see also* R. 12-2 at 1, R. 12-3 at 1.]

Conversely, Saylor argues that the Pension Committee should have evaluated her claim under Section 6.04(d) and Section 2.38 only if she had not met the SSA-based standard of Section 4.06, but fails to cite to any language in the Plan that prescribes such a process. Moreover, her pleadings do not explain why this alternative process is proper under the Plan and in fact, fail to even mention the Amendments or Summary Plan Description, documents which directly contradict the process for which she advocates.

It is well-recognized that where employers make drafting mistakes within an ERISA plan, leading to conflicts within the plan, this can cause confusion, ultimately disadvantaging plan beneficiaries. *See Haus v. Bechtel Jacobs Co.,* 491 F.3d 557, 566 (6th Cir. 2007). However, the record shows no evidence of an understanding or belief by Saylor prior to the instant lawsuit that the Total Disability determination would be based solely upon the SSA award of benefits. Saylor did not demonstrate any reliance on the SSA-based standard in Section 4.06 until after the Pension Committee conducted a full evaluation of her medical record and denied her application for Total Disability benefits. As such, "ERISA's central object of protecting employees' justified expectations of receiving the benefits that they have been promised" is not

---

[6] Section 6.04(d) reads: "[T]his Plan provides for determination of Total Disability to be made by the [Pension] Committee (rather than in sole reliance on a Social Security determination)…" [R. 8-1 at 42.]

11

undermined by ARH's denial of Total Disability benefits. *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 740 (2004).

After considering the relevant documents on record, the Court concludes it was the intent and understanding of the parties that the determination of whether a member of the Plan was "Totally Disabled" was within the discretion of the Pension Committee. Whether the ultimate decision by the Pension Committee to deny Saylor benefits was "arbitrary and capricious" in light of the medical evidence will not be considered, as the sole issue raised by Saylor was whether the Plan provisions afforded the Pension Committee the discretion to consider the evidence and then make the Total Disability determination. Therefore, ARH's decision to deny Saylor Total Disability benefits will be upheld.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant Appalachian Regional Hospital's Motion for Summary Judgment [R. 12] is **GRANTED**;

2. Plaintiff Saylor's Motion for Summary Judgment [R. 11] is **DENIED**;

3. Plaintiff's Motion for Extension of Time [R. 10] is denied as **MOOT**; and

3. Judgment will be entered contemporaneously and consistent with this Memorandum Opinion and Order.

This the 29th day of September, 2017.

Gregory F. Van Tatenhove
United States District Judge